UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
In Re: MICHAEL G. TYSON,                  :   09 Civ. 9966 (DLC)
                                          :
              Debtor.                     :
---------------------------------------- X
In Re: MICHAEL G. TYSON,                  :   09 Civ. 9967 (DLC)
                                          :
              Debtor.                     :
---------------------------------------- X
In Re: MICHAEL G. TYSON,                  :   10 Civ. 313 (DLC)
                                          :
              Debtor.                     :
---------------------------------------- X   OPINION & ORDER

APPEARANCES:

For Chris Webb and Straight-Out Promotions, LLC:
J. Bruce Miller
Norma C. Miller
J. Bruce Miller Law Group
605 West Main Street
Louisville, KY 40202

For Frank Warren:
Howard Karasik
Sherman, Citron & Karasik, P.C.
605 Third Avenue, 25th Floor
New York, NY 10158

For Edward Simons:
Jethro M. Eisenstein
Profeta & Eisenstein
14 Wall Street, 22nd Floor
New York, NY 10005-2101

For R. Todd Neilson, Plan Administrator:
Robert J. Feinstein
Alan J. Kornfeld
Beth E. Levine
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 36th Floor
New York, NY 10017

<u>TABLE OF CONTENTS</u>

BACKGROUND............................................... 3

   I.  Tyson's Bankruptcy Petition ........................... 3

   II. Pre-Fight Contract Negotiations ..................... 4

   III.The July 26 Assignment ............................ 8

   IV. Breach of the July 26 Assignment ...................... 9

   V.  Procedural History .................................. 10

DISCUSSION.............................................. 12

   I.  Jurisdiction and Standard of Review ................... 12

   II. Warren's and Simons' Appeal .......................... 17

       A.  Principles of Determining Foreign Law...............18

       B.  Piercing the Veil Under English Law.................19

          1.  The Veil of Incorporation......................... 19

          2.  Survey of English Law............................. 25

          3.  Principles of English Law......................... 35

       C.  Factual Findings on Veil-Piercing Claim.............46

       D.  Application of English Law..........................52

       E.  Plaintiff's Fraud and Unjust Enrichment Claims......57

       F.  Warren's Claim for Attorney's Fees..................59

   III. Kentucky Defendants' Appeal ......................... 62

       A.  Kentucky Default Judgment...........................63

          1.  Facts and Procedural History..................... 63

          2.  Analysis......................................... 67

       B.  Rule 15(b)(2) & Rule 54 Motions.....................71

       C.  Attorney's Fees.....................................73

CONCLUSION.............................................. 73

DENISE COTE, District Judge:

These three bankruptcy appeals arise out of a professional
boxing match featuring bankruptcy debtor Mike Tyson ("Tyson"), a
former world heavyweight champion.  The principal issue on
appeal is whether English law permits piercing the veil of a
Gibraltar corporation, Brearly (International) Ltd. ("Brearly"),
which breached its contracts with Tyson and Straight-Out
Promotions, LLC ("Straight-Out") in connection with a boxing

match held in Louisville, Kentucky on July 30, 2004 (the "Fight").  Following trial, the Honorable Allan L. Gropper, United States Bankruptcy Judge, concluded that appellants Frank Warren ("Warren") and Edward Simons ("Simons"), two British boxing promoters, were liable under English law for Brearly's breaches of contract.  For the following reasons, the Bankruptcy Court's holding of liability on the veil-piercing claims is reversed, the judgment of the Bankruptcy Court is vacated in part, and the case is remanded for further proceedings.

<u>BACKGROUND</u>

The following facts, which are undisputed unless otherwise indicated, are taken from the record on appeal, the submissions of the parties, and the Bankruptcy Court's August 19, 2009 opinion.  See <u>Neilson v. Straight-Out Promotions, LLC (In re Tyson)</u>, 412 B.R. 623 (Bankr. S.D.N.Y. Aug. 19, 2009) ("<u>In re Tyson</u>" or the "August 2009 Opinion").  Only those facts relevant to the issues on appeal are discussed below.

I.   Tyson's Bankruptcy Petition

On August 1, 2003, Tyson and his wholly owned corporation, Michael Mike Tyson Enterprises Inc., each filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").  Their joint bankruptcy reorganization

plan (the "Chapter 11 Plan") -- which was filed in June 2004,
confirmed in September 2004, and made effective in November 2004
-- created a liquidating trust (the "Liquidating Trust") and
named R. Todd Neilson as plan administrator (the "Plaintiff").[1]
The Chapter 11 Plan contemplated that Tyson would pay his
creditors, in part, by participating in a series of boxing
matches and evenly splitting the proceeds with his creditors.

## II.   Pre-Fight Contract Negotiations

In May 2004, while the Chapter 11 Plan was taking shape,
Tyson's manager reached agreement with Chris Webb ("Webb") to
have Tyson fight in a boxing match in Kentucky that Webb and his
company, Straight-Out (collectively, the "Kentucky Defendants"),
would arrange and promote.  This match, the Fight, was the first
in a series of bouts in which Tyson fought pursuant to his
Chapter 11 Plan.

On June 10, 2004, Webb's friend, the matchmaker Sampson
Lewkowicz ("Lewkowicz"), attended a promotional event in
Manchester, England hosted by Sports Network, PLC ("Sports
Network"), a partnership between Warren and his minority

---

[1] Under the Chapter 11 Plan, the Plaintiff was given authority to
prosecute legal claims on behalf of the Liquidating Trust,
including claims for breach of post-petition contracts entered
into by Tyson.

partner, Sports & Leisure Boxing, Ltd. ("Sports & Leisure").[2]  At
the Manchester event, Lewkowicz ran into Stephen Heath
("Heath"), an attorney for Sports Network, and began talking
business.  In particular, Lewkowicz asked Heath whether Warren
would be interested in acquiring the international pay-per-view
rights to the Fight (the "International Rights") from Straight-
Out and then selling the International Rights to distributors or
business partners on a country-by-country basis.

Heath got Warren on the phone, and Warren said that he was
not interested in selling the International Rights.[3]  After this
conversation, however, Warren instructed his business partner,
Simons,[4] to follow up with Lewkowicz about the possibility of

---

[2] The Bankruptcy Court described Warren as "a well-known English
boxing promoter with over 35 years of experience, who has
promoted multimillion-dollar boxing matches around the world."
In re Tyson, 412 B.R. at 627.  The court found that "[a]s Sports
Network's majority stakeholder and managing director, Warren
held a tight grip over every aspect of the partnership's
operations, and people in the boxing industry perceive him and
Sports Network as one and the same."  Id.

[3] The Bankruptcy Court found that Warren did not want to deal
with Tyson because the two had once been in a physical
altercation.  In re Tyson, 412 B.R. at 629 n.6.  In his
submissions on appeal, Warren concedes that he possesses "animus
towards Tyson" and describes himself as a "known enemy" of
Tyson.

[4] The Bankruptcy Court found that Simons was "a veteran of the
boxing business with decades of experience" who, at the time of
the Fight, was also "Sports Network's chief executive officer
and Warren's right-hand man."  In re Tyson, 412 B.R. at 627.
Simons also held a minority interest in Sports & Leisure and
served as one of its directors.  Id. at 627-28.

arranging for Danny Williams ("Williams"), an English boxer for whom Warren acted as an agent, to be Tyson's opponent in the Fight.  After Simons, Heath, and Lewkowicz met in person, Simons called Webb to propose that Tyson fight Williams and that the Kentucky Defendants sell the International Rights for $2 million.

Webb was receptive to this proposal.  Direct negotiations then ensued between Webb, acting for Straight-Out, and Heath, purportedly acting for Sports & Leisure.  After several weeks of negotiation, the parties reached an agreement (the "Distribution Agreement") along the following lines: (1) Tyson's opponent in the Fight would be Williams; (2) the International Rights would be assigned to Brearly, which would then coordinate the sale of the International Rights in foreign countries; (3) before the Fight, Brearly would pay Straight-Out a "minimum guaranteed compensation" of $2.7 million as an advance against Straight-Out's negotiated share of Brearly's proceeds (the "International Proceeds") from selling the International Rights; and (4) after payment of commissions and overhead, all International Proceeds above $2.7 million would be split 45/45/10 among Brearly, Straight-Out, and Lewkowicz.  Brearly was a Gibraltar shell company incorporated by Peter Abbey ("Abbey"), an English

investor acquainted with Simons.[5]  The decision to introduce Brearly into the transaction, filling the role that the parties had previously contemplated for Sports & Leisure, lies at the heart of these appeals.

On or about June 30, Heath flew to Louisville to meet with Webb and reduce the Distribution Agreement to written form. Final agreement could not be reached, however, on whether the $2.7 million minimum guarantee was to be secured by a letter of credit or deposited in an escrow account, nor on whether the forum for litigating any disputes arising under the contract would be Kentucky or Gibraltar.  Nevertheless, the parties proceeded to carry out their respective tasks under the Distribution Agreement as it then existed.  Beginning in mid-June and continuing until the end of July, Simons and others, acting on Brearly's behalf, sold the International Rights to distributors, broadcasters, or business partners in some three dozen countries or groups of countries throughout Europe, Asia, and Latin America.

On July 16, two weeks before the Fight, Straight-Out and Tyson signed a contract (the "Event Agreement") under which Straight-Out agreed to pay Tyson a total purse of $7.2 million and to secure that purse with a series of letters of credit

---

[5] The facts concerning Brearly's origins and ownership are set forth in detail in Section II.D of the discussion below.

before the Fight.  Also on July 16, Straight-Out reached an
agreement with Showtime, a premium television network, under
which Showtime would broadcast the Fight in the United States
and Straight-Out would pay Showtime's marketing expenses.
Straight-Out was required to immediately post a $1.3 million
letter of credit to secure that obligation.

### III. The July 26 Assignment

Only five days later, on July 21, the Fight was put in
jeopardy when Straight-Out failed to meet certain deadlines with
respect to its payment obligations.  In particular, Straight-Out
failed to provide Showtime its $1.3 million letter of credit and
failed to provide Tyson a letter of credit for the final $1.975
million installment of his purse.  According to the Kentucky
Defendants, they experienced a funding shortfall only because
Brearly had not yet paid Straight-Out its $2.7 million minimum
guarantee under the Distribution Agreement.

On July 26, four days before the Fight, Straight-Out and
Brearly reached an assignment agreement (the "July 26
Assignment") that enabled the Fight to proceed.[6]  The July 26
Assignment provided that the first $1.3 million of the

---

[6] The July 26 Assignment, styled as a "Notice of Irrevocable
Authority and Assignment," was signed by Straight-Out and
Brearly alone, but Tyson's attorney Stephen Espinoza
("Espinoza") actively participated in the pertinent negotiations
as Tyson's representative.

International Proceeds would be paid to Showtime on Straight-Out's behalf, and Warren also provided a personal guarantee that Showtime would be paid.  The July 26 Assignment also assigned to Tyson certain rights to payment held by Straight-Out under the latter's Distribution Agreement with Brearly.  Specifically, Tyson was guaranteed to receive at least $1.4 million (less certain "Recoupable Expenses") from Brearly in lieu of Brearly's payment to Straight-Out, but Tyson would receive up to $1.9 million, assuming available proceeds.[7]  The July 26 Assignment specifically contemplated, however, that Straight-Out remained liable to Tyson for the final $1.9 million of his purse in the event that Brearly did not pay or in the event that the International Proceeds were insufficient.

IV.  Breach of the July 26 Assignment

The Fight was held as planned on July 30.  Williams scored a major upset by knocking out Tyson in the fourth round.  The international pay-per-view sales of the Fight, however, were disappointing.  An income statement prepared by Sports Network on Brearly's behalf (the "Income Statement") showed that the International Proceeds amounted to only about $1.9 million in gross revenue, which was not enough to satisfy all of Brearly's

---

[7] Tyson had also been given $75,000 worth of tickets to the Fight, reducing the outstanding balance of his purse from $1.975 million to $1.9 million.

contractual obligations.  Indeed, after all overhead and fees were paid,[8] only $135,795 was available to satisfy Tyson's claim, far short of the amount guaranteed by the July 26 Assignment.[9] Brearly then failed to fulfill its obligations under the July 26 Assignment, and its counsel, Marrache, reserved Brearly's rights to object to any obligations that the July 26 Assignment purportedly placed on Brearly.  Thereafter, Tyson was not paid any portion of the remaining $1.9 million of his purse by either Brearly or Straight-Out.

### V.   Procedural History

On June 15, 2005, the Plaintiff initiated an adversary proceeding (the "Adversary Proceeding") in the Bankruptcy Court to pursue claims of breach of contract, unjust enrichment, and fraudulent inducement against Brearly, Warren, Straight-Out, and Webb.  Warren answered the complaint on October 6, 2005, while Brearly purported to file a <u>pro se</u> answer on October 11, 2005.

The Kentucky Defendants, however, did not answer, and on May 31, 2006, a default judgment was entered against them.  One

---

[8] These amounts included the payment of $1.3 million to Showtime; a $109,746 commission to Sports Network for handling the UK sales on Brearly's behalf; and various other direct and indirect expenses, including sales commissions and attorney's fees.

[9] Tyson's contractual entitlement under the July 26 Assignment worked out to approximately $1.24 million, which represents the minimum guarantee of $1.4 million less Brearly's "Recoupable Expenses."

year later, they moved to vacate the default judgment.  By
Opinion and Order of August 17, 2007, the Bankruptcy Court
granted the Kentucky Defendants' motion and vacated the default
judgment.  See Neilson v. Straight-Out Promotions, LLC (In re
Tyson), Adv. No. 05-02210 (ALG), 2007 WL 2379624 (Bankr.
S.D.N.Y. Aug. 17, 2007) (the "August 2007 Opinion").

Meanwhile, on June 20, 2007, the Plaintiff filed an amended
complaint naming additional defendants, including Simons, Sports
Network, and Sports & Leisure (collectively, with Warren, the
"UK Defendants").  Upon re-joining the litigation, the Kentucky
Defendants asserted a cross-claim for breach of contract against
Brearly and for veil-piercing against the UK Defendants.  The
Plaintiff's second amended complaint was filed on January 17,
2008.

Following Brearly's putative pro se answer in October 2005,
Brearly ceased to participate in the litigation.  Accordingly, a
default was entered against Brearly on January 23, 2008.

A trial on the Plaintiff's claims and the Kentucky
Defendants' cross-claims was held on March 23-27, 2009.  On
August 19, 2009, Judge Gropper held in favor of the Plaintiff on
his breach of contract claims against the Kentucky Defendants
and Brearly; pierced Brearly's corporate veil to hold the UK
Defendants liable for Brearly's breach; and denied all other
claims for relief.  In re Tyson, 412 B.R. at 629.  Following

post-trial motion practice, the Bankruptcy Court entered final judgment on October 27, 2009 (the "Judgment").[10]  These three bankruptcy appeals ensued and collectively became fully briefed on April 2, 2010.

### DISCUSSION

I.   Jurisdiction and Standard of Review

The parties contest on appeal whether the Adversary Proceeding fell within the Bankruptcy Court's core jurisdiction. The Plaintiff and Simons contend that the proceedings were "core," while the Kentucky Defendants and Warren contend that the proceedings were "non-core."  In the alternative, Warren asserts that the Bankruptcy Court's exercise of jurisdiction in the Adversary Proceeding was unconstitutional under N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) ("Marathon").

"A bankruptcy court's power to enter appropriate orders and judgments in a given bankruptcy proceeding . . . hinges on

---

[10] The Bankruptcy Court entered judgment in favor of the Plaintiff and against the following defendants in the following amounts: Straight-Out, in the amount of $1,900,000; Brearly, in the amount of $1,237,850; and Simons, Warren, Sports Network, and Sports & Leisure, each in the amount of $1,237,850.  The Judgment also provides for pre- and post-judgment interest on all claims.  The Judgment provides, however, that the Plaintiff's aggregate recovery from all parties may not exceed $1,900,000 plus applicable interest, and that the Plaintiff's aggregate recovery from Brearly and/or the UK Defendants may not exceed $1,237,850 plus applicable interest.

whether the proceeding is 'core' or 'related,' consistent with
the constitutional limits that Marathon established."  Bankr.
Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.), 529
F.3d 432, 460 (2d Cir. 2008) ("In re CBI") (citation omitted).
Core proceedings are those that are "essential or basic to the
administration of a bankruptcy case."  Cent. Vt. Pub. Serv.
Corp. v. Herbert, 341 F.3d 186, 190 (2d Cir. 2003).  A non-
exhaustive definition is set forth in 28 U.S.C. § 157(b)(2),
which specifies, inter alia, that the bankruptcy court possesses
core jurisdiction with respect to "matters concerning the
administration of the estate."  28 U.S.C. § 157(b)(2)(A).  This
provision is broadly construed.  "In crafting § 157, Congress
realized that the bankruptcy court's jurisdictional reach was
essential to the efficient administration of bankruptcy
proceedings and intended that the 'core' jurisdiction be
construed as broadly as possible subject to the constitutional
limitations established in Marathon."  In re CBI, 529 F.3d at
460 (citation omitted); see also Luan Inv. S.E. v. Franklin 145
Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 228-29 (2d Cir.
2002).  Section 157 provides that "[t]he bankruptcy judge shall
determine . . . whether a proceeding is a core proceeding under
this subsection or is a proceeding that is otherwise related to
a case under title 11."  28 U.S.C. § 157(b)(3).

The Adversary Proceeding fell within the Bankruptcy Court's core jurisdiction.  At least two reasons for this conclusion are evident.  First, proceedings to enforce a bankruptcy debtor's post-petition contracts fall within core bankruptcy jurisdiction.  See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.), 197 F.3d 631, 637-38 (2d Cir. 1999) ("The bankruptcy court has core jurisdiction over claims arising from a contract formed post-petition under § 157(b)(2)(A)."); Ben Cooper, Inc. v. Ins. Co. (In re Ben Cooper, Inc.), 896 F.2d 1394, 1400 (2d Cir. 1990) (observing that "[t]he adjudication of [post-petition contract] claims is an essential part of administering the estate"), vacated on other grounds, 498 U.S. 964 (1990), reinstated, 924 F.2d 36 (2d Cir. 1991).[11]  Indeed, the Bankruptcy Court itself observed as much in an earlier opinion.  See August 2007 Opinion, 2007 WL 2379624, at *3 ("Bankruptcy courts clearly have core jurisdiction to enforce a debtor's post-petition contracts.").

Second, even if the Adversary Proceeding was not "core," Warren and the Kentucky Defendants did not object to the

---

[11] Warren relies upon Wood v. Wood (Matter of Wood), 825 F.2d 90, 97 (5th Cir. 1987), for the proposition that a post-petition dispute arising under state law is not embraced within the core jurisdiction provided by 28 U.S.C. § 157.  That case has been expressly disapproved in this Circuit, however.  See In re Ben Cooper, Inc., 896 F.2d at 1400 ("To the extent that Wood conflicts with our holding, we decline to follow it.").

Bankruptcy Court's assumption of jurisdiction and therefore impliedly consented to the exercise of that jurisdiction.  See Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.), 419 F.3d 83, 98 (2d Cir. 2005) ("Parties may, by their conduct, submit themselves to the bankruptcy court's jurisdiction. . . . [Parties who] actively litigate in the bankruptcy court without contesting personal jurisdiction can transform a non-core proceeding into a core one."); Herbert, 341 F.3d at 190 ("bankruptcy jurisdiction can exist" when "consented to by the parties"); Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.), 834 F.2d 1134, 1137-38 (2d Cir. 1987) (concluding that a party's "failure to object to [the court's] assumption of 'core jurisdiction' at any point in th[e] extensive proceedings before the bankruptcy court . . . constitutes consent to [its] final adjudication of this controversy").[12]  Therefore, the Bankruptcy Court properly entered the Judgment, and this Court possesses appellate jurisdiction to review the Judgment pursuant to 28 U.S.C. § 158(a)(1).

---

[12] Warren also argues that the Plaintiff failed to comply with the Bankruptcy Rules by not pleading the Bankruptcy Court's core jurisdiction in his complaint.  See Fed. R. Bankr. P. 7008(a) ("In an adversary proceeding before a bankruptcy judge, the complaint, counterclaim, cross-claim, or third-party complaint shall contain a statement that the proceeding is core or non-core . . . .").  Warren waived his objection on this ground, however, by impliedly consenting to the Bankruptcy Court's exercise of jurisdiction.

The standard of review applicable to matters within core bankruptcy jurisdiction is governed by the Federal Rules of Bankruptcy Procedure.  On appeal, the court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.  "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . ."  Id.; see Solow v. Kalikow (In re Kalikow), 602 F.3d 82, 91 (2d Cir. 2010) (noting that "[f]indings of fact are reviewed for clear error.").  Likewise, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013; cf. U.S. v. Iodice, 525 F.3d 179, 185 (2d Cir. 2008) (counseling "particularly strong deference" to findings based on "credibility determinations").  Although the Bankruptcy Court's findings of fact "are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden," H & C Dev. Grp., Inc. v. Miner (In re Miner), 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999), and the reviewing court must be "left with the definite and firm conviction that a mistake has been made."  ASM Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 582 F.3d 422, 426 (2d Cir. 2009).  Legal conclusions of the Bankruptcy Court, however, are "reviewed de novo."  In re Kalikow, 602 F.3d at 91.  Finally, mixed questions of law and

fact are reviewed either "de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." Serv. Emps. Int'l, Inc. v. Dir., Office of Workers Comp. Program, 595 F.3d 447, 455 (2d Cir. 2010) (citation omitted).

## II. Warren's and Simons' Appeal

Warren and Simons assert on appeal that the Bankruptcy Court erred in piercing Brearly's corporate veil.[13] By stipulation of all parties, the Plaintiff's and Kentucky Defendants' veil-piercing claims against Brearly are governed by English law.[14] These appeals therefore require the Court to determine the content of English law in order to resolve the disputed legal questions on appeal.

---

[13] On appeal, both Warren and Simons contest not only the availability of veil-piercing in general, but the sufficiency of the Bankruptcy Court's fact-finding as to each of them individually. Because the Bankruptcy Court's decision to pierce the veil is reversed on general grounds, the Court need not reach the latter question.

[14] Brearly was incorporated in Gibraltar, a self-governing overseas dependency of the United Kingdom. Courts regularly look to English law in ascertaining the law of Gibraltar, see, e.g., Carbotrade S.p.A. v. Bureau Veritas, 99 F.3d 86, 89 (2d Cir. 1996), and the parties have stipulated to doing so here. See also English Law (Application) Act, Act No. 1962-17 § 2(1) (Gib.) (providing, in pertinent part, that "[t]he common law and the rules of equity from time to time in force in England shall be in force in Gibraltar").

A.   Principles of Determining Foreign Law

"Determination of a foreign country's law is an issue of law."  Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 92 (2d Cir. 1998) ("Itar-Tass").  The Federal Rules of Civil Procedure provide that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  Under Rule 44.1, the court is free to conduct "[its] own research and interpretation" into the content of foreign law.  Ackermann v. Levine, 788 F.2d 830, 838 n.7 (2d Cir. 1986); see also In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 209 (2d Cir. 2003) (per curiam); Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 n.3 (2d Cir. 1968).  "'[A]ppellate courts, as well as trial courts, may find and apply foreign law,'" Itar-Tass, 153 F.3d at 92 (quoting Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)), and the Court of Appeals has "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations."  Curley, 153 F.3d at 13.  Although a court may "enlist the parties in th[e] effort" to determine foreign law, "[u]ltimately, the responsibility for correctly identifying and applying foreign law rests with the court."  Rationis Enters.

Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd., 426 F.3d 580,
586 (2d Cir. 2005).

The parties have not offered expert testimony concerning
the content of English law at any point during the instant
litigation, nor were they required to do so.[15]  Accordingly, the
Court considers the authorities cited by the parties on appeal,
the authorities relied upon by the Bankruptcy Court, and the
Court's independent investigation of relevant primary and
secondary authorities.  Because "[t]he court's determination [of
foreign law] must be treated as a ruling on a question of law,"
the Bankruptcy Court's conclusions of English law are reviewed
de novo.  Fed. R. Civ. P. 44.1; see Nordwind v. Rowland, 584
F.3d 420, 429 (2d Cir. 2009).

B.   Piercing the Veil Under English Law

     1.   The Veil of Incorporation

     Under English law, a corporation is a separate legal entity
from its directors, officers, members, shareholders, or other

---

[15] Several courts have cautioned against undue reliance on the
testimony of experts in determining foreign law.  See, e.g.,
Sunstar, Inc. v. Alberto-Culver Co., 586 F.3d 487, 495 (7th Cir.
2009) (describing "articles, treatises, and judicial opinions"
as "superior sources" of foreign law compared with the testimony
of experts, who are often "selected on the basis of the
convergence of their views with the litigating position of the
client"); Itar-Tass, 153 F.3d at 92 (observing that a court
determining foreign law should consider "not the credibility of
the experts," but rather, "the persuasive force of the opinions
they express[]").

controlling parties.  This principle was definitively

established in the case of <u>Salomon v. A. Salomon & Co., Ltd.</u>,

[1897] A.C. 22 (H.L.).[16]  In that case, the creditors of a shoe-

making business operated by Aron Salomon sought to establish

that his company was "a myth and a fiction," "a mere scheme," or

"only an 'alias'" in order to require Salomon to pay the debts

of his company, which had become insolvent.  <u>Id.</u> at 31-32, 42.

The Court of Appeal, which is England's intermediate appellate

court, ruled in favor of Salomon's creditors, accepting "the[ir]

proposition that the formation of [Salomon's] company and all

that followed on it were a mere scheme to enable the appellant

to carry on business in the name of the company, with limited

---

[16] Citations for English cases in this Opinion are given in
modified Bluebook format.  The following case reporter
abbreviations are used: "A.C." for The Law Reports, Appeal
Cases; "Ch." for The Law Reports, Chancery Division; "Q.B." for
The Law Reports, Queen's Bench Division; "All E.R." for All
England Reports; "S.C.(H.L.)" for Session Cases (House of
Lords); "W.L.R." for The Weekly Law Reports; "S.L.T." for Scots
Law Times; "B.C.C." for British Company Cases; and "B.C.L.C."
for Butterworth's Company Law Cases.  For cases since 2001, the
following neutral citation forms are used: "EWCA Civ" for the
Court of Appeal of England and Wales (Civil Division); "EWCA
Crim" for the Court of Appeal of England and Wales (Criminal
Division); and "EWHC" for the High Court of England and Wales.
To designate the court rendering each decision, the following
abbreviations are given parenthetically the first time a case is
cited: "H.L." for House of Lords; "C.A." for Court of Appeal;
"Ch." for the High Court Chancery Division; "Q.B.D." or "K.B.D."
for the High Court Queen's/King's Bench Division; and "Fam." for
the High Court Family Division.  Bracketed dates in citations
for pre-2001 cases reflect the year a case was published, not
the year it was decided.

liability, contrary to the true intent and meaning of the Companies Act, 1862." Id. at 43 (Lord Herschell).

On further appeal, the House of Lords unanimously reversed the Court of Appeal in a landmark seriatim opinion that continues to be widely cited.[17]  Lord Macnaghten's speech has become the key passage:

> The company is at law a different person altogether from the subscribers to the memorandum [of incorporation]; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the [Companies] Act.  That is, I think, the declared intention of the enactment.

Id. at 51.  The four other Law Lords who heard the case concurred with the same reasoning.[18]  Moreover, the Law Lords

_____

[17] See, e.g., Yukong Line Ltd. of Korea v. Rendsburg Invs. Corp. of Liberia (The Rialto), [1998] 1 W.L.R. 294, 303 (Q.B.D.) (Toulson, J.) ("Yukong") (relying on Salomon for the proposition that "a limited company has a legal existence independent of its members and is not the agent of its members").

[18] See [1897] A.C. at 30-31 (Lord Halsbury L.C.) ("[I]t seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself . . . . whatever may have been the ideas or schemes of those who brought it into existence."); id. at 42 (Lord Herschell) (" I am at a loss to understand what is meant by saying that [the company] is but an 'alias' for A. Salomon.  It is not another name for the same person; the company is ex hypothesi a distinct legal persona."); id. at 54 (Lord Morris) (concurring generally); id. at 56 (Lord Davey) (finding Salomon not liable because his company was a "duly formed legal persona").

made clear that their reasoning applied with equal force even to the putative "one-man company." See, e.g., id. at 44 (Lord Herschell) ("It is said that the respondent company is a 'one-man' company . . . . [But] I am unable to see how it can be lawful for three or four or six persons to form a company for the purpose of . . . limited liability, and not for one person to do so . . . .").

Notwithstanding the Salomon principle, English courts do recognize that the veil of incorporation may be pierced, or "lifted,"[19] under certain circumstances,[20] as Salomon itself

---

[19] At least one court has distinguished between "piercing" and "lifting" according to the purpose for which corporate personality is disregarded. See Atlas Mar. Co. S.A. v. Avalon Mar. Ltd. (The Coral Rose), [1991] 4 All E.R. 769, 779 (C.A.) (Staughton, L.J.) ("Atlas") ("To pierce the corporate veil is an expression that I would reserve for treating the rights and liabilities or activities of a company as the rights or liabilities or activities of its shareholders.  To lift the corporate veil or look behind it, on the other hand, should mean to have regard to the shareholding in a company for some [other] legal purpose.").  Nevertheless, this Opinion follows the more common practice of using these two terms interchangeably.

[20] This Opinion discusses only judicial veil-piercing, and therefore, does not consider circumstances in which disregard of the corporate form is authorized or required by statute.  See, e.g., Insolvency Act 1986 (c. 45) § 213 (individual liability to the bankruptcy estate for debts of insolvent company where "fraudulent trading" has occurred during the winding-up process); id. § 214 (same for "wrongful trading," wherein individual "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation"); Companies Act 2006 (c. 46) § 993(1) ("If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who is

suggested.  <u>See, e.g.</u>, <u>id.</u> at 33 (Lord Herschell) (implying
that, if Salomon had used his company to commit fraud, the
result would have been different).  The parties agree on appeal
with the Bankruptcy Court's articulation that, under English
law, the corporate veil "'may be pierced only in extremely
limited circumstances'" and that "'[i]n order for the veil to be
pierced, the corporate structure must have been devised as a
mere facade concealing true facts.'"  <u>In re Tyson</u>, 412 B.R. at
640 (quoting UK Defendants' Post-Trial Memorandum of Law).

     Nevertheless, the parties vigorously disagree as to how
that general statement of law applies to the facts of this case.
The Bankruptcy Court did not elaborate that general statement
into a formal legal standard, if only because such standards do
not appear to exist.  Indeed, U.S. courts have previously noted
that "'[u]nlike American law, English case law does not provide
an enumerated set of factors that a court can evaluate in
deciding whether to lift the corporate veil.'"  <u>Gabriel Capital,</u>
<u>L.P. v. NatWest Fin., Inc.</u>, 122 F. Supp. 2d 407, 433 n.13
(S.D.N.Y. 2000) ("<u>Gabriel Capital</u>") (quoting <u>United Trade</u>
<u>Assocs. Ltd. v. Dickens & Matson (USA) Ltd.</u>, 848 F. Supp. 751,

---

knowingly a party to the carrying on of the business in that
manner commits a[] [criminal] offence.").

760 (E.D. Mich. 1994)).[21]   A resolution of these appeals requires
the Court to survey English law concerning piercing the
corporate veil in some detail.[22]

---

[21] The court in <u>Gabriel Capital</u>, for its part, reiterated the
general statement that "'English law . . . will pierce the
corporate veil and recognize one entity as the alter ego of
another only where special circumstances exist indicating that
the relationship of one corporation to another is a mere facade
concealing the true facts.'"   <u>Gabriel Capital</u>, 122 F. Supp. 2d
at 433 n.13 (quoting <u>Great Lakes Overseas, Inc. v. Wah Kwong
Shipping Grp., Ltd., Inc.</u>, 990 F.2d 990, 997 (7th Cir. 1993)).

[22] The secondary sources that have been most helpful include:
Georgina Andrews, <u>The Veil of Incorporation--Fiction or Façade?</u>,
Bus. L. Rev., Jan. 2004, at 4 ("Andrews"); Thomas Cheng,
<u>Piercing the Veil Across the Atlantic: A Comparative Study of
the English and the U.S. Corporate Veil Doctrines</u> (unpublished
manuscript) (2010); P.L. Davies et al., <u>Gower & Davies'
Principles of Modern Company Law</u> (8th ed. 2008) ("Davies");
Gore-Browne, <u>Company Law Precedents</u> (Lord Millett et al. eds.,
44th ed. 2010) ("Gore-Browne"); Simon Goulding, <u>Company Law</u> (2d
ed. 1999) ("Goulding"); Andrew Hicks & S.H. Goo, <u>Cases &
Materials on Company Law</u> (6th ed. 2008); John Lowry & Alan
Dignam, <u>Company Law</u> (2d ed. 2003) ("Lowry & Dignam"); Marc
Moore, <u>"A Temple Built on Faulty Foundations": Piercing the
Corporate Veil and the Legacy of Salomon v. Salomon</u>, J. Bus. L.,
Mar. 2006, at 180; S. Ottolenghi, <u>From Peeping Behind the
Corporate Veil, to Ignoring It Completely</u>, 53 Mod. L. Rev. 338
(1990); Jennifer Payne, <u>Lifting the Corporate Veil: A
Reassessment of the Fraud Exception</u>, 56 Cambridge L.J. 284
(1997) ("Payne"); Len Sealy & Sarah Worthington, <u>Cases and
Materials in Company Law</u> (8th ed. 2008) ("Sealy & Worthington");
Susan Watson, <u>Two Lessons from "Trustor"</u>, 119 L.Q. Rev. 13
(2003) ("Watson"); Peter Ziegler & Lynn Gallagher, <u>Lifting the
Corporate Veil in the Pursuit of Justice</u>, J. Bus. L., July 1990,
at 292.   The Court has also relied upon a similar survey of
English veil-piercing law contained in Justice (now Lord
Justice) Munby's opinion in <u>Hashem v. Shayif</u>, [2008] EWHC 2380
(Fam.) [¶¶ 101-08, 144-221].

2.   Survey of English Law

The earliest leading case holding that the veil of incorporation may be lifted under appropriate circumstances is Gilford Motor Co., Ltd. v. Horne, [1933] Ch. 935 (C.A.) ("Gilford").[23]  In Gilford, the defendant, Horne, attempted to evade his contractual obligations under a nonsolicitation agreement by forming a company to compete with Horne's former employer and actively solicit its customers.  The Court of Appeal, reversing the decision below and granting the plaintiff an injunction to enforce the covenant, held seriatim that the injunction bound not only Horne but his company as well.  Lord Justice Lawrence reasoned that "the company was a mere cloak or sham for the purpose of enabling the defendant to commit a breach of his covenant against solicitation."  Id. at 965 (Lawrence, L.J.).  Likewise, Lord Hanworth M.R. reached the conclusion that "th[e] company was formed as a device, a stratagem, in order to mask the effective carrying on of a business of Mr. E. B. Horne.  The purpose of it was to try to

---

[23] Earlier cases are also sometimes cited, albeit less frequently.  See Daimler Co., Ltd. v. Cont'l Tyre & Rubber Co. (Gr. Brit.), Ltd., [1916] 2 A.C. 307 (H.L.) (concluding that the corporate veil may be lifted to determine the nationality of a company's ownership in a time of war); Re Darby, ex parte Brougham, [1911] 1 K.B. 95, 101 (K.B.D.) ("Darby") (holding liable the two incorporators of an insolvent Guernsey company for the company's debts, where the company was "merely an alias" for the incorporators and where the incorporators had already been convicted of fraud relating to the company's issuance of materially misleading prospectuses).

enable him, under what is a cloak or a sham, to engage in business . . . in respect of which he had a fear that the plaintiffs might intervene and object." Id. at 956; see also id. at 969 (Romer, L.J.) ("[T]his defendant company was formed and was carrying on business merely as [a] cloak or sham for the purpose of enabling the defendant Horne to commit the breach of the covenant that he entered into deliberately with the plaintiffs . . . .").

Thirty years later, in Jones v. Lipman, [1962] 1 W.L.R. 832 (Ch.) (Russell, J.), the Chancery Division pierced the corporate veil on facts somewhat similar to those in Gilford. In Jones, the first defendant, Lipman, contracted to sell some London property to the plaintiffs, but then changed his mind before the closing. Instead, Lipman conveyed the property to another defendant, Alamed Ltd. ("Alamed"), which was a company formed by Lipman and "under [his] complete control." Id. at 835. The court awarded specific performance of the sale contract not only against Lipman, but against Alamed as well, holding that "specific performance cannot be resisted by a vendor who, by his absolute ownership and control of a limited company in which the property is vested, is in a position to cause the contract to be completed." Id. at 835-36. Citing the Lord Justices' observations in Gilford, and concluding that they "appl[ied] even more forcibly to the present case," Justice Russell

26

declared that "[t]he defendant company is the creature of the first defendant, a device and a sham, a mask which he holds before his face in an attempt to avoid recognition by the eye of equity." Id. at 836.  The court concluded, as a matter of principle, that "an equitable remedy is rightly to be granted directly against the creature in such circumstances." Id. at 836-37.

Principally based on the authority of Gilford and Jones, the English courts thereafter became increasingly amenable to granting applications to lift the corporate veil.  In Littlewoods Mail Order Stores Ltd. v. Inland Revenue Comm'rs, [1969] 1 W.L.R. 1241 (C.A.) ("Littlewoods"), Lord Denning M.R. stated:

> I decline to treat the Fork Manufacturing Co. Ltd. as a separate and independent entity.  The doctrine laid down in Salomon v. Salomon & Co. [1897] A.C. 22, has to be watched very carefully.  It has often been supposed to cast a veil over the personality of a limited company through which the courts cannot see. But that is not true.  The courts can and often do draw aside the veil.  They can, and often do, pull off the mask.  They look to see what really lies behind. . . . I think that we should look at the Fork Manufacturing Co. Ltd. and see it as it really is -- the wholly-owned subsidiary of Littlewoods.  It is the creature, the puppet, of Littlewoods in point of fact: and it should be so regarded in point of law.

Id. at 1254.[24]  Likewise, in Wallersteiner v. Moir, [1974] 1

W.L.R. 991 (C.A.), the Court of Appeal considered the corporate

personality of various foreign entities owned by an influential

London businessman named Dr. Wallersteiner.  Lord Denning M.R.

stated:

> I am prepared to accept that the English concerns --
> those governed by English company law or its
> counterparts in Nassau or Nigeria -- were distinct
> legal entities. . . . I will assume, too, that [the
> Liechtenstein concerns] were distinct legal entities,
> similar to an English limited company.  Even so, I am
> quite clear that they were just the puppets of Dr.
> Wallersteiner.  He controlled their every movement.
> Each danced to his bidding.  He pulled the strings.
> No one else got within reach of them.  Transformed
> into legal language, they were his agents to do as he
> commanded. . . . I am of the opinion that the court
> should pull aside the corporate veil and treat these
> concerns as being his creatures -- for whose doings he
> should be, and is, responsible.

Id. at 1013 (citing Gilford).  But see id. at 1027 (Buckley,

L.J.) ("[W]ith the greatest deference to Lord Denning M.R., I do

not think we are justified in identifying Dr. Wallersteiner with

I.F.T. [the Bahamian company] . . . on the ground that I.F.T.

---

[24] In his separate opinion, Lord Justice Karminski observed that
although "Fork and . . . Littlewoods[] are two separate entities
in law" based on "the rule in Salomon," it was nevertheless
"necessary here, as I think, to look at what I believe to be the
realities of this situation."  Littlewoods, [1969] 1 W.L.R. at
1256 (Karminski, L.J.); see Adams v. Cape Indus. Plc, [1990] Ch.
433, 543 (C.A.) (Slade, L.J.) (observing that Lord Justices
Karminski and Sachs "refrained" from adopting Lord Denning
M.R.'s reasoning, thereby making it dicta).

was merely the puppet of Dr. Wallersteiner or on any other ground.").[25]

Finally, in 1985, the Court of Appeal applied <u>Wallersteiner</u> to impose liability on an individual defendant who had created a "sophisticated and intricate network" of some eighty "interrelated English and foreign companies and foreign trusts as a mechanism through which [he] could at will dispose of his English assets." <u>Re a Company</u>, [1985] 1 B.C.C. 99421, 99425 (C.A.) (Cumming-Bruce, L.J.). The court, relying on <u>Wallersteiner</u>, declared that "the court will use its powers to pierce the corporate veil if it is necessary to achieve justice irrespective of the legal efficacy of the corporate structure under consideration." <u>Id.</u>

The extension of British veil-piercing law suggested by <u>Littlewoods</u>, <u>Wallersteiner</u>, <u>D.H.N.</u>, and <u>Re a Company</u> was tempered, however, by a contrary tendency beginning in the late 1970s. Most importantly, in 1978, the House of Lords cautioned that it "ha[d] some doubts whether . . . the Court of Appeal [in

---

[25] In <u>D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council</u>, [1976] 1 W.L.R. 852 (C.A.) ("<u>D.H.N.</u>"), Lord Denning M.R. pierced the corporate veil separating three companies in order to enable the parent company to recover "disturbance" payments (i.e., compensation for the exercise of eminent domain) on behalf of one of its subsidiaries, thereby inaugurating the "single economic entity" doctrine. As made clear by subsequent cases, however, this doctrine never gained broad support and was ultimately short-lived. <u>See</u> <u>Adams</u>, [1990] Ch. at 532-39.

D.H.N.] properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that [it] is a mere façade concealing the true facts."[26]  Woolfson v. Strathclyde Reg'l Council, [1978] S.C.(H.L.) 90, 96 (Lord Keith of Kinkel).

In 1989, a case was decided that strongly re-asserted the Salomon principle and thereby cast into doubt the foregoing developments in English veil-piercing jurisprudence.  That decision was Adams v. Cape Industries Plc, [1990] Ch. 433 (C.A.), a complex litigation involving the plaintiff's attempt to enforce in the United Kingdom a default judgment he had obtained in Texas federal court against the defendant ("Cape"), a global asbestos manufacturer and distributor.  The Court of Appeal concluded that Cape had been "present" in the United States at the time of the Texas default judgment was entered only if the corporate veil between Cape and its U.S. affiliates were lifted.

---

[26] This passage from Woolfson is widely cited as embodying the general rule on veil-piercing under English law.  See, e.g., Jennings v. Crown Prosecution Serv., [2008] 1 A.C. 1046, 1048 (H.L.) (citing and paraphrasing Woolfson).  Woolfson derived this statement from Tunstall v. Steigmann, [1962] 2 Q.B. 593 (C.A.), in which the Court of Appeal observed: "Whilst it may be argued that in the above circumstances the courts have departed from a strict observance of the principle laid down in [Salomon], it is true to say that any departure, if indeed any of the instances given can be treated as a departure, has been made to deal with special circumstances when a limited company might well be a facade concealing the real facts."  Id. at 601-02 (Ormerod, L.J.).

After surveying the existing body of English veil-piercing cases, the court noted "one well-recognised exception to the rule prohibiting the piercing of 'the corporate veil,'" namely, "'where special circumstances exist indicating that it is a mere façade concealing the true facts.'"  Id. at 539 (Slade, L.J.) (quoting Woolfson, 1978 S.C.(H.L.) at 96).  The plaintiff suggested three scenarios in which he believed the Woolfson exception should be applied, the last being "where a defendant by the device of a corporate structure attempts to evade . . . such rights of relief as third parties may in the future acquire."  Id. at 544.  The court considered whether the third condition was an accurate statement of the law, and concluded that it was not:

> As to condition (iii), we do not accept as a matter of
> law that the court is entitled to lift the corporate
> veil as against a defendant company which is the
> member of a corporate group merely because the
> corporate structure has been used so as to ensure that
> the legal liability (if any) in respect of particular
> future activities of the group (and correspondingly
> the risk of enforcement of that liability) will fall
> on another member of the group rather than the
> defendant company.  Whether or not this is desirable,
> the right to use a corporate structure in this manner
> is inherent in our corporate law.

Id. at 544.  Elsewhere in his opinion -- the sole opinion offered by the Court of Appeal in the case -- Lord Justice Slade likewise concluded:

> If a company chooses to arrange the affairs of its
> group in such a way that the business carried on in a

31

> particular foreign country is the business of its
> subsidiary and not its own, it is, in our judgment,
> entitled to do so.  Neither in this class of case nor
> in any other class of case is it open to this court to
> disregard the principle of Salomon v. A. Salomon & Co.
> Ltd., [1897] A.C. 22 merely because it considers it
> just so to do.

Id. at 537.  Lord Justice Slade's controlling opinion thus not

only ruled that the plaintiff was not entitled to enforce his

default judgment in the United Kingdom, but also sent a clear

message that the English courts had strayed too far from the

orthodoxy of Salomon.

The extent to which Adams would reverse course was at first

unclear.  Despite Adams' sweeping language, a lower court

opinion three years later applied Adams narrowly.  In Creasey v.

Breachwood Motors Ltd., [1992] B.C.C. 638 (Q.B.D.), Richard

Southwell Q.C., sitting as a Deputy High Court Judge,

distinguished Adams on its facts, observing that the case before

him did not involve the defendants' intentions to structure a

corporate group to shield against hypothetical liabilities in

the future, but rather, "to evade responsibility for the

contingent liabilities to [the plaintiff] for breach of his

contract of employment" by transferring assets away from the

company that had employed plaintiff, thereby rendering it

judgment-proof.  Id. at 647.  The Creasey court also stated that

"[t]he most important factor in this case" was that the

individual defendants "themselves deliberately ignored the

32

separate corporate personalities" of their companies, thereby
"disregard[ing] their duties as directors and shareholders" to
the company whose assets were stripped.  Id. at 647-48.

Creasey, however, was soon criticized.  In Ord v. Belhaven
Pubs Ltd., [1998] B.C.C. 607 (C.A.), the Court of Appeal relied
on Adams to reverse the trial court, finding that it had
"disregard[ed] the distinction between the legal entities that
were involved" by erroneously concluding that "since the company
cannot pay, the shareholders who are the people financially
interested should be made to pay instead."  Id. at 615
(Hobhouse, L.J.).  Lord Justice Hobhouse, writing for the panel,
then went out of his way to address Creasey, which in his view
had relied on "a very similar train of thought to that which was
followed by the [trial] judge in the present case."  Id. at 616.
The Court of Appeal declared that Creasey "represents a wrong
adoption of the principle of piercing the corporate veil" and
that the case "should no longer be treated as authoritative."
Id.

Nevertheless, it is clear that Adams has not, as a
practical matter, foreclosed all judicial veil-piercing.  For
example, in Trustor AB v. Smallbone, [2001] 1 W.L.R. 1177 (Ch.)
("Trustor"), Sir Andrew Morritt V-C pierced the corporate veil
to hold liable Smallbone who, in breach of his fiduciary duty to
the plaintiff corporation (for which he served as managing

director), directed certain funds to be withdrawn from the corporation and transferred to a Gibraltar company, Introcom (International) Ltd., which Smallbone controlled.[27]  The court held that Smallbone was personally liable for Introcom's receipt of the misappropriated funds because Smallbone had interposed Introcom as "a device or facade . . . used as the vehicle for the receipt of the money" diverted from Trustor.[28]  Id. at 1186 [¶ 25].

Despite many decades of veil-piercing jurisprudence since Salomon, only the highlights of which are set forth above, English courts caution that it remains difficult to determine when it is appropriate to lift the veil.  In Adams, the Court of Appeal observed:

> From the authorities cited to us we are left with rather
> sparse guidance as to the principles which should guide
> the court in determining whether or not the arrangements
> of a corporate group involve a façade within the meaning
> of that word as used by the House of Lords in Woolfson,
> 1978 S.L.T. 159.  We will not attempt a comprehensive
> definition of those principles.

Adams, [1990] Ch. at 543 (Slade, L.J.).  Recent cases have expressed a certain measure of bewilderment as to the current

---

[27] In particular, Smallbone was the beneficiary of a Liechtenstein "Anstalt" entity, which in turn was the sole owner of Introcom.  Trustor, [2001] 1 W.L.R. at 1183 [¶ 15].

[28] At least one commentator has subsequently questioned whether it was necessary to pierce the veil in order to hold Smallbone liable, given his breach of fiduciary duty to the plaintiff corporation.  See Watson at 13-17.

state of the law.[29]  Moreover, the metaphorical language in which

the holdings of Gilford, Jones, Wallersteiner, and similar cases

are couched has exacerbated the difficulties of achieving

analytical clarity.  See Yukong, [1998] 1 W.L.R. at 305

(observing, with regard to veil-piercing, that "metaphor can be

used to illustrate a principle; it may also be used as a

substitute for analysis and may therefore obscure reasoning").

   3.  Principles of English Law

   Bearing in mind these words of caution, some general

conclusions about the current state of English veil-piercing law

may be drawn.  First, given Salomon, the fact that a person

engages in the "carrying on of a business" using a duly

incorporated, yet seemingly artificial, entity is not sufficient

---

[29] See, e.g., Raja v. Van Hoogstraten, [2006] EWHC 2564 (Ch.) [¶
30] (observing that English veil-piercing law "is not clear"),
aff'd, [2008] EWCA Civ 1444; Kensington Int'l Ltd. v. Congo,
[2005] EWHC 2684 (Q.B.D.) ("Kensington") [¶ 177] (noting "a
number of cases where the courts have thought it right to
'pierce the corporate veil,' although the meaning of the
expression and its out-working differs in the varying contexts
of the authorities concerned"); Yukong, [1998] 1 W.L.R. at 310
("The cases have not worked out what is meant by 'piercing the
corporate veil.'  It may not always mean the same thing."
(citation omitted)); Creasey, [1993] B.C.C. at 647 ("The [case
law] authorities . . . provide only limited guidance as to the
circumstances in which this power [of veil-piercing] is to be
exercised.").  To similar-effect, Gore-Browne has observed that
"[i]t is not possible to formulate any single principle as the
basis for these decisions, nor are all the decisions, as to when
the separate legal entity of the company must be respected or
when it may be disregarded, entirely consistent with one
another."  Gore-Browne ¶ 1.3.1.

to justify piercing that entity's veil.  Legal formalisms must
be respected even at the risk of abiding a seeming injustice:
"[S]ave in cases which turn on the wording of particular
statutes or contracts, the court is not free to disregard the
principle of [Salomon] merely because it considers that justice
so requires."  Adams, [1990] Ch. at 536 (Slade, L.J.); see also
Hashem, [2008] EWHC 2380 [¶ 160] ("[T]he court cannot pierce the
corporate veil . . . merely because it is thought to be
necessary in the interests of justice."); Kensington, [2005]
EWHC 2684 [¶ 177] ("The authorities make it plain that the
separate personality of the company cannot be ignored merely
because a court considers that it might be just to do so.");
Trustor, [2001] 1 W.L.R. at 1185 [¶ 21] (rejecting "interests of
justice" approach to veil-piercing).  But see Ratiu v. Conway,
[2005] EWCA Civ 1302 (C.A.) (Auld, L.J.) [¶ 78] (arguing in
favor of "lifting the corporate veil where the facts require
it," when a breach of fiduciary duty has occurred).  Likewise,
courts may no longer have regard to the "the realities of the
situation" in an attempt to align the law with economic
circumstances.  Adams, [1990] Ch. at 534.[30]  Accordingly, veil

---

[30] See also Adams, [1990] Ch. at 538 ("'[Counsel] suggested
beguilingly that it would be technical for us to distinguish
between parent and subsidiary company in this context;
economically, he said, they were one.  But we are concerned not
with economics but with law.  The distinction between the two
is, in law, fundamental and cannot be bridged.'" (quoting Bank

piercing is quite rare under English law.  See Hashem, [2008]
EWHC 2380 [¶ 221] (noting that opportunities for veil-piercing
are "'extremely limited indeed'" and that "[r]eported cases in
any context where the claim has succeeded are few in number and
striking on their facts." (quoting Ord, [1998] B.C.C. at 615)).[31]

Second, courts may "pierce the corporate veil only where
special circumstances exist indicating that [it] is a mere
façade concealing the true facts."  Woolfson, 1978 S.C.(H.L.) at
96; see Hashem, [2008] EWHC 2380 [¶ 151] (describing Woolfson's
"statement of principle" as "[t]he starting point" for veil-
piercing analysis).  In construing the Woolfson principle,
courts observe that "an element of impropriety or dishonesty" is
required to pierce the veil.  Kensington, [2005] EWHC 2684 [¶
178]; see also Hashem, [2008] EWHC 2380 [¶ 161] ("[T]he
corporate veil can be pierced only if there is some

---

of Tokyo Ltd. v. Karoon, [1987] A.C. 45, 64 (C.A.) (Goff,
L.J.)); Kensington, [2005] EWHC 2684 [¶ 180] (noting that
although "a court looks for the substance of a matter" in
determining whether to pierce the corporate veil, it "looks for
the legal substance, not its economic substance, if
different.").

[31] Commentators express similar caution about the usefulness or
viability of the veil-piercing doctrine.  See, e.g., Davies at
208-09 ("The doctrine of lifting the veil plays a small role in
British company law . . . . Even where the case for applying the
doctrine may seem strong, as in the undercapitalised one-person
company . . . the courts are unlikely to do so."); Sealy &
Worthington at 53 ("The topic of 'lifting the veil' persists in
company law textbooks . . . yet all the signs are that, after a
brief flurry of interest some decades ago, there is now little
potential for it to develop into a doctrine of any substance.").

'impropriety.'"); Ord, [1998] B.C.C. at 615 (discussing Adams
and stating "there must be some impropriety before the corporate
veil can be pierced").  This requirement may be satisfied, in
part, by evidence of the defendant's subjective intent to
defraud.  "Following Jones v. Lipman, we agree . . . [that]
where a façade is alleged, the motive of the perpetrator may be
highly material."  Adams, [1990] Ch. at 542; see also id. at 540
("In our judgment . . . whenever a device or sham or cloak is
alleged in cases such as this, the motive of the alleged
perpetrator must be legally relevant . . . .").

     Nevertheless, although evidence of impropriety is
necessary, it is not in itself sufficient to justify veil-
piercing.  "[T]he court cannot, on the other hand, pierce the
corporate veil merely because the company is involved in some
impropriety."  Hashem, [2008] EWHC 2380 [¶ 162].  For example,
the fact that a "façade" company has breached a contract is not,
in itself, dispositive of the veil-piercing inquiry.  See
Dadourian Grp. Int'l Inc. v. Simms, [2006] EWHC 2973 (Ch.)
("Dadourian") [¶ 683] ("It is not permissible to lift the veil
simply because a company has been involved in wrong-doing, in
particular simply because it is in breach of contract."), aff'd,
[2009] EWCA Civ 169 (C.A.).[32]  Instead, "the court is entitled to

--------

[32] Likewise, in Trustor, the Vice-Chancellor observed that
"[c]ompanies are often involved in improprieties" and that "it

38

'pierce the corporate veil' . . . [and hold liable] the individual(s) in control of it [only] if the company was used as a device or facade to conceal the true facts thereby avoiding or concealing any liability of those individual(s)." Trustor, [2001] 1 W.L.R. at 1185 [¶ 23].  Trustor has subsequently been interpreted to mean that "[t]he impropriety must be linked to the use of the company structure to avoid or conceal liability." Hashem, [2008] EWHC 2380 [¶ 162].  "[I]t follows from all this that if the court is to pierce the veil it is necessary to show both control of the company by the wrongdoer(s) and impropriety, that is, (mis)use of the company by them as a device or façade to conceal their wrongdoing."  Id. [¶ 163].[33]  Moreover, the court may pierce the veil "only so far as is necessary to provide a remedy for the particular wrong which those controlling the company have done."  Id. [¶ 164]; see also

---

would make undue inroads into the principle of Salomon's case if an impropriety not linked to the use of the company structure to avoid or conceal liability for that impropriety was enough." Trustor, [2001] 1 W.L.R. at 1185 [¶ 22].

[33] Note that the veil-piercing inquiry does not turn on the purpose for which the corporate structure was originally formed. "[A] company can be a façade even though it was not originally incorporated with any deceptive intent." Hashem, [2008] EWHC 2380 [¶ 164]; see also Payne at 290.  For example, in Trustor, the fact that Introcom was a genuine company with a separate trading existence did not prevent its corporate veil from being pierced.  Trustor, [2001] 1 W.L.R. at 1185 [¶ 16].  "The question is whether [the company] is being used as a façade at the time of the relevant transaction(s)."  Hashem, [2008] EWHC 2380 [¶ 164].

Dadourian, [2006] EWHC 2973 [¶ 682] ("[T]he veil, if it is to be lifted at all, is to be lifted for the purposes of the relevant transaction.").

Third, where a corporate structure is interposed for the purpose of shielding a defendant from liability to the plaintiff or other third parties, the plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure.  In Adams, a corporate structure that was "clearly a façade in the relevant sense" was nevertheless not able to be pierced because "there was nothing illegal as such in [the parent corporation] arranging its affairs" to avail itself of the Salomon principle in order to shield itself from contingent future liabilities.  Adams, 1990 Ch. at 543-44.  Adams thus drew a clear distinction between a defendant using a corporate structure to "evade . . . such rights of relief against him as third parties already possess" -- conduct for which veil-piercing may apply -- and a defendant using a corporate structure to evade "such rights of relief as third parties may in the future acquire" -- conduct which, good or bad, was thought "inherent in our corporate law." Adams, [1990] Ch. at 544.  Indeed, the court in Hashem observed:

> The common theme running through all the cases in
> which the court has been willing to pierce the veil is
> that the company was being used by its controller in

> an attempt to immunize himself from liability for some
> wrongdoing which existed entirely dehors [i.e.,
> outside or irrespective of] the company.  It is
> therefore necessary to identify the relevant
> wrongdoing -- in Gilford and Jones v. Lipman it was a
> breach of contract which, itself, had nothing to do
> with the company, in Gencor [ACP Ltd. v. Dalby, [2000]
> 2 B.C.L.C. 734 (Ch.)] and Trustor it was a
> misappropriation of someone else's money which again,
> in itself, had nothing to do with the company --
> before proceeding to demonstrate the wrongful misuse
> or involvement of the corporate structure.

Hashem, [2008] EWHC 2380 [¶ 199]; see also Lindsay v.

O'Loughnane, [2010] EWHC 529 (Q.B.D.) [¶¶ 132-40] (quoting and

relying upon Hashem's analysis); Law Soc'y of Eng. & Wales v.

Habitable Concepts Ltd., [2010] EWHC 1449 (Ch.) ("Law Society")

[¶ 20] (same).

     Other recent veil-piercing cases have reached the same

conclusion as Hashem in this respect.  In Kensington, the High

Court stated that "[t]he corporate structure could legitimately

be used" to limit "the legal liability (if any) in respect of

particular future activities," while "transactions or

structures, which have no legal substance, and which are set up

with a view to defeating existing claims of creditors . . . can,

if they are purely a sham and a façade, be treated by the court

as lacking validity."  Id. [¶¶ 185, 187] (emphasis added).

Indeed, the Kensington court's decision to pierce the veil

expressly depended on a finding that "[u]nlike Adams, the

liabilities of the [defendant] are not future potential

liabilities but existing liabilities under extant judgments."
Id. [¶ 190].  Moreover, in Kuwait Oil Tanker Co. SAK v. Al
Bader, Justice Teare permitted post-judgment veil-piercing to
treat a company's assets as those of the judgment debtor, but
only because the court was "satisfied that [the company] was
acquired by Mr. Al Bader . . . for the purpose of ensuring that
his assets would not be available to meet his then existing
(though not yet established) liability to the Claimants for
fraud."  [2008] EWHC 2432 (Q.B.D.) [¶ 35] (emphasis added).[34]
Commentators also regard the distinction between existing legal
duty and potential future liability as fundamental to
understanding English veil-piercing law.[35]

---

[34] Note, however, that Creasey also lifted the corporate veil
where the defendants had used the corporate form to defeat
"existing (though not yet established) liability" to the
plaintiff, who sued after they had caused him to be unlawfully
discharged from employment.  Creasey was explicitly disapproved
by the Court of Appeal in Ord.

[35] See, e.g., Andrews at 7 ("[S]heltering behind the fictional
veil of incorporation to limit personal liability for future
business activities in the absence of any specific planned
impropriety linked to the company structure, is simply
legitimate reliance on the principle articulated in
[Salomon].");  Goulding at 72 ("[Ord's] rejection of Creasey
makes it unlikely that the courts will ever be willing to lift
the veil unless there is clear evidence of a transfer designed
to avoid an existing contractual or other liability." (emphasis
added));  Payne at 290 ("In order for the fraud exception to the
Salomon principle . . . to be successfully invoked, the
defendant must have the intention to use the corporate structure
in such a way as to deny the plaintiff some pre-existing legal
right.");  Sealy & Worthington at 63 ("In both [Gilford] and
[Jones], the company whose separate existence was disregarded

Fourth, where the plaintiff may recover in fraud or "deceit" against a defendant directly, that path is preferable to indirect liability via veil-piercing.  This principle was made plain by the High Court in Dadourian, where the plaintiffs' claims against the defendants included fraudulent misrepresentation, civil conspiracy, and breach of contract on a veil-piercing theory.  Dadourian, [2006] EWHC 2973 [¶¶ 15-16].  In a preceding arbitration, the defendants had been found liable for fraudulent misrepresentation.  Id. [¶ 2].  The High Court observed that "whilst a person committing the tort of deceit should be liable for all the loss which flows from his misrepresentation, it would be unprincipled to impose a liability on him for the loss of bargain [i.e., contract damages] suffered by a misrepresentee in respect of a contract with a third party with whom he had been induced to contract by the misrepresentation."  Id. [¶ 684].  The court reasoned:

> [I]t may well be that where A contracts with B as a result of B's fraudulent misrepresentation and the contract has been completed . . . A is able to claim (a) damages for loss of bargain as a result of B's breach of contract and (b) reliance loss, although he could not obtain double recovery.  It does not follow that B should be liable for contractual damages to A where the contract which he procured was one between A

had been set up deliberately in an attempt to evade an existing obligation," while in Adams, it "was made clear that the law does not look with similar disfavour on the formation of a limited liability company in order to confine the future or contingent liabilities of an enterprise within specific limits.").

and C, even where C is the creature of B.  To put the
point another way, where in that example the principle
of corporate separation exemplified in [<u>Salomon</u>] would
apply absent a misrepresentation by the person
controlling the company, there is no need, and it
would be inappropriate, to lift the veil in order to
provide A with a contractual remedy against B; A
recovers all his loss arising as a result of the
misrepresentation by his tortious claim in deceit.

<u>Id.</u> [¶ 685] (Warren, J.).[36]  Applying this reasoning, where an

individual ("B") has, by making fraudulent misrepresentations,

procured a contract between the plaintiff ("A") and a third

party ("C"), and C subsequently breaches that contract, any

claim that A possesses against B sounds in tort rather than in

contract, "even where C is the creature of B."  Thus, where

"[t]he Claimants have their remedy . . . in the form of an

action for fraudulent misrepresentation," "[t]here is simply no

need . . . to lift the veil at all."  <u>Id.</u> [¶ 686].[37]

---

[36] To the extent this reasoning reflects the common law
preference for legal remedies over equitable ones, a similar
principle applies under U.S. law.  "It is well-established under
New York law that equity will not entertain jurisdiction where
there is an adequate remedy at law."  <u>Superint't of Ins. v. Ochs
(In re First Cent. Fin. Corp.)</u>, 377 F.3d 209, 215 (2d Cir. 2004)
(citation omitted); <u>see also Reg'l Airport Auth. of Louisville
v. LFG, LLC</u>, 460 F.3d 697, 711 (6th Cir. 2006) ("Kentucky
follows the traditional rule that equitable relief is not
available where there exists an adequate remedy at law.").

[37] Although Justice Warren proceeded to articulate alternative
grounds for his decision "in case [he was] wrong in that
approach," <u>id.</u> [¶ 688], his judgment was affirmed, <u>see
Dadourian</u>, [2009] EWCA Civ 169, and subsequent justices of the
High Court have relied on <u>Dadourian</u>'s reasoning.  <u>See, e.g.,
Lindsay v. O'Loughnane</u>, [2010] EWHC 529 (Q.B.D.) [¶ 130] (Flaux,
J.) (applying <u>Dadourian</u> for the principle that "where a claim in

Although Dadourian was the first case to articulate this fourth principle clearly, it was not the first to suggest its existence.  For example, in 2002, Lord Hoffmann observed in dicta that, if an individual defendant makes a fraudulent misrepresentation on behalf of a company, that individual defendant need not be held liable through a circuitous veil-piercing theory but rather, may be made to answer for his own tort.  Std. Chartered Bank v. Pak. Nat'l Shipping Corp., [2002] UKHL 43 [¶¶ 20-22], [2003] 1 A.C. 959, 968-69 (H.L.) ("SCB"); see also Lowry & Dignam at 47 (citing SCB and observing that "if the tort is deceit rather than negligence the courts will allow personal liability to flow to a director or employee").  The seeds of Dadourian's reasoning were, in fact, sown as early as Salomon, wherein Lord Davey observed that "[i]f [Salomon] has committed a fraud or misdemeanour . . . he may be proceeded against civilly" by the plaintiff).  Salomon, [1897] A.C. at 57.

Finally, although not a veil-piercing principle per se, English courts have observed that parties may avoid the harsh effects of the Salomon principle by the exercise of due

deceit succeed[s] against the person controlling the company, it would be inappropriate to permit the veil to be lifted to enable the claimant to pursue a contractual claim against that person"); Law Society, [2010] EWHC 1449 [¶ 22] (Norris, J.) (refusing to "press the principle of piercing the corporate veil beyond its proper bounds[;] particularly when there is an alternative" in tort); Hashem, [2008] EWHC 2380 [¶¶ 158-59, 165].

diligence, for instance, by contracting around a potential problem.  As Lord Herschell observed in Salomon itself: "[I]t must be remembered that no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held."  Salomon, [1897] A.C. at 46 (Lord Herschell).  More recently, in Yukong, the High Court stated that "[i]t has long been recognised that the Salomon principle can cause hardship, although those dealing with one-man companies may, and commonly do, seek to protect themselves by requiring a personal guarantee."  Yukong, [1998] 1 W.L.R. at 305 (citation omitted).  As such, assuming a plaintiff has acted prudently to protect itself, veil-piercing is unnecessary because the plaintiff may recover directly on a breach of guarantee against the defendant.

C.    Factual Findings on Veil-Piercing Claim

    Before applying this determination of English law to the question of whether Brearly's corporate veil may be lifted to impose liability on the UK Defendants, it is helpful to describe the Bankruptcy Court's decision.  The court held, following trial, that Brearly's liability for breach of contract should be imposed on the four UK Defendants as a matter of English law. In ascertaining the content of English law, the Bankruptcy Court

relied upon the UK Defendants' post-trial memorandum of law;

various English cases (including Gilford, Trustor, Kensington,

and Ord); and a number of New York and Kentucky cases, whose

reasoning the court relied upon by analogy.

The Bankruptcy Court's factual findings, construed in the

light most favorable to the Plaintiff, are as follows.  Brearly

was a "shell corporation" formed under Gibraltar law by Abbey,

an English investor "who was a friend and business acquaintance

of Simons."  In re Tyson, 412 B.R. at 628.  Abbey permitted

Simons to use Brearly "as the vehicle to carry out the

transactions relating to the international rights to the Fight"

on the sole condition that "Simons perform all the work."  Id.

at 631.  Abbey was Brearly's sole shareholder,[38] and "[a]t the

time of the Fight, Brearly had minimal capitalization (if any),

no assets, no offices and no employees, and it had never engaged

in any business."  Id. at 628; see also id. at 640-41.  Further,

although some of the contracts entered into by Brearly required

Fight proceeds to be deposited into a "Brearly" bank account,

there was no evidence that Brearly had its own bank account.

Id. at 640-41.  The Bankruptcy Court thus concluded that

"Brearly was not what the UK Defendants said it was" -- "an

---

[38] According to the parties' submissions on appeal, Abbey was one
of two corporate officers of Brearly.  The other officer was an
unidentified individual at Marrache, Brearly's counsel in
Gibraltar.

offshore subsidiary or affiliate of Sports Network used for the purpose of saving taxes" -- but rather, "someone else's shelf entity, a corporate shell, with no employees, capital or business, used as a 'facade concealing true facts.'"  Id. at 640.

It was undisputed at trial that none of the UK Defendants were incorporators, owners, directors, shareholders, or employees of Brearly, or otherwise legally related to that entity.  Nonetheless, the Bankruptcy Court made ample findings concerning activities undertaken by the UK Defendants -- and, in particular, by Simons -- on Brearly's behalf.  Simons and Heath "were the only parties who negotiated with Straight Out in connection with the acquisition of the international rights to the Fight." Id.  In representing Brearly, Simons and Heath "used Sports Network's stationery and business facilities in England to carry on all [of Brearly's] business."[39]  Id. at 641. The actual sales of the International Rights were conducted on Brearly's behalf by Simons, among others.[40]  Id. at 632.  Simons

---

[39] On appeal, the Plaintiffs also rely on evidence that all communications sent by Heath were from Sports Network or Warren-affiliated email addresses.

[40] Simons also involved David McConachie ("McConachie") and Chester English in selling the International Rights on Brearly's behalf.  In addition to working for Sports Network, McConachie had his own business, and the parties disagree on appeal regarding the capacity in which McConachie was asked to work for Brearly.

took responsibility for approving all of Brearly's licensing deals, collecting revenues, paying out expenses, keeping all accounting records, and overseeing administrative tasks performed by others.[41]   Id. at 631.  The post-Fight income statement summarizing the International Proceeds was prepared on Brearly's behalf by a Sports Network accountant.   Id. at 635 & n.13.  Indeed, aside from Abbey's initial consent to allow Brearly to be used, and aside from Marrache's apparent role in approving (and later repudiating) the July 26 Assignment, every person who acted on Brearly's behalf in connection with the Fight was someone who was also affiliated with, or employed by, Sports Network or Sports & Leisure.

Based on this and other evidence, the Bankruptcy Court concluded that "Brearly never had a real interest in the transaction or a true economic stake, and the UK Defendants ignored its position when it suited their interests."   Id. at 641.  For instance, the UK Defendants caused Brearly to assign to Sports Network its right to sell the Fight in the United Kingdom, apparently because Sports Network had an exclusive contractual relationship with the only broadcaster capable of televising the Fight there.   Id. at 632, 641.  The UK Defendants also paid Showtime its $1.3 million out of Sports Network's

---

[41] The Plaintiff contends on appeal, for example, that McConachie prepared Brearly's invoices at Simons' instruction.

revenues from the UK sales, thus satisfying Warren's personal guarantee to Showtime (as well as Brearly's obligation to Showtime under the July 26 Assignment).  Id. at 641.  Likewise, the UK Defendants caused Brearly to appear and then default in certain post-Fight litigation in Kentucky[42] -- conduct which the Bankruptcy Court regarded as an "abuse of the process of two courts . . . [that] constitutes a further misuse of the corporate form that supports veil piercing."  Id.

The Bankruptcy Court further found that the UK Defendants introduced Brearly to the transaction with improper motives. Namely, the court found that the UK Defendants used Brearly with the intent to "injure and defraud" Tyson and the Kentucky Defendants by causing Brearly to agree to the Distribution Agreement and the July 26 Assignment "without any intention of honoring them."  Id. at 642.  In reaching this conclusion, the Bankruptcy Court relied on the trial testimony of Espinoza and Webb and the deposition testimony of Abbey.  Espinoza, Tyson's attorney, "testified credibly that Heath had told him, in several conversations in the days leading up to the Assignment Agreement, that Brearly was a Sports Network company being used for tax purposes and that it had been used in this manner previously."  Id. at 633-34.  The court explained that Espinoza "believed Heath because this use of an offshore company was

---

[42] This litigation is described in Section III.A below.

credible and, '[e]ssentially, everything that [Espinoza] saw in connection with Brearly came from Sports Network.'"  Id. at 634. Likewise, the Bankruptcy Court found that Webb had been "told by Simons that Brearly was an offshore Sports Network entity being used to distribute the Fight."  Id. at 632.  Finally, the Bankruptcy Court credited testimony by Abbey in which he speculated that the reason why Simons had asked him to use Brearly was "'because it helped [the] deal with Frank Warren and Sports Network.'"  Id. at 642.

Finally, the Bankruptcy Court found further evidence of bad faith in the circumstances surrounding Brearly's breach of the July 26 Assignment.  The court found that Marrache repudiated the July 26 Assignment on the basis that "'Brearly ha[d] neither been consulted nor been made a party to any . . . agreement.'" Id. at 634.  The court also found, however, that "[t]he signed version of the [July 26] Assignment Agreement bears a fax transmittal line showing a fax transmission from Marrache & Co., Brearly's law firm in Gibraltar, to Sports Network, and a further fax from Sports Network to Louisville, all on the day of the Fight."  Id.  As a result, the Bankruptcy Court concluded that the UK Defendants had caused Brearly to disavow the July 26 Assignment for "wholly spurious reasons."  Id. at 642.

Tying together its findings, the Bankruptcy Court concluded that "the UK Defendants used Brearly as part of a scheme or ruse

to accomplish Warren's goals: have Williams fight Tyson and
possibly go on to secure a championship fight for Sports
Network, while avoiding any liability to Tyson and Straight
Out."  Id. at 644.  The Bankruptcy Court concluded that "there
could be no more apt description of the actions of the UK
Defendants than that they devised 'the corporate structure . . .
as a mere facade concealing true facts.'"  Id. at 640 (quoting
UK Defendants' Post-Trial Memorandum of Law).  As such, the
Bankruptcy Court decided to lift Brearly's corporate veil and
hold the UK Defendants personally liable.

D.   Application of English Law

     Notwithstanding all of the foregoing evidence, and the
deference owed on appeal to the Bankruptcy Court's fact-finding,
English law does not permit Brearly's corporate form to be
disregarded to hold the UK Defendants liable for Brearly's
debts.  At least two considerations compel this conclusion.

     First, the Court has located no support in English law for
the proposition that parties who are legally unrelated to a
corporate entity may be held responsible for that entity's
liabilities, at least in the absence of specific statutory
authority.[43]  The Plaintiff has also not directed the Court to

---

[43] Where a statute so authorizes, however, a non-director may be
treated as akin to a director.  See Customs & Excise Comm'rs v.
Holland (In re Paycheck Servs., 3 Ltd.), [2009] EWCA Civ 625

any legal authority that would refute the arguments made by Warren and Simons on appeal that strangers to a corporate entity may not be held liable through judicial veil-piercing for that entity's obligations.  Nor does the Plaintiff contest the fact that Brearly was incorporated, owned, and controlled (aside from the transaction in question) by one man, Peter Abbey, against whom neither the Plaintiff nor the Kentucky Defendants have brought any claims.

This legal question was insufficiently addressed by the parties during the Adversary Proceeding.  The Bankruptcy Court observed that "[n]o case has been cited where someone else's corporate shell was used in a scheme like the one at bar." <u>Id.</u> at 643.  In the absence of legal guidance from the parties regarding how English law would address this question, the Bankruptcy Court concluded that "the use of an unrelated shell corporation appears more abusive than the use of an entity that is owned by those in control." <u>Id.</u>  The court reasoned that "[u]se of someone else's shell entity would appear to permit those in control to disclaim responsibility and repudiate agreements more easily" than could a parent corporation with

---

(C.A.) [¶¶ 45-47] (describing the liability of a "de facto" director under the Insolvency Act 1986 §§ 212, 251); <u>see also</u> <u>R. v. K</u>, [2005] EWCA Crim 619 (C.A.) [¶¶ 16-26] (concluding that the legal ownership or control of a corporation may be disregarded for purposes of applying the Proceeds of Crime Act 2002 § 80(3)).

respect to its subsidiary or affiliate.  Id.  This appeal to equity, however, runs counter to the principles of English law described above that prohibit piercing the corporate veil on the basis of equity alone.

A comparison to veil-piercing in the United States may be instructive.[44]  U.S. courts proceed from the assumption that, when the corporate veil is pierced, it is done in order to hold liable someone with a legal interest in the corporate entity. Nonetheless, many U.S. jurisdictions, including New York, have recognized a doctrine of "equitable ownership" whereby persons who are not formally affiliated with a corporation by law may nevertheless be held liable on a veil-piercing theory.  "New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that the individual is not a shareholder of the corporation."  Freeman v. Complex Computing Co., Inc., 119 F.3d 1044, 1051 (2d Cir. 1997) (citing Guilder v. Corinth Constr. Corp., 651 N.Y.S.2d 706, 707 (App. Div. 3d Dep't 1997)); see also Lally v. Catskill Airways,

---

[44] As the description of English law on veil-piercing demonstrates, however, American and English law have diverged in their treatment of this doctrine.  Thus, there can be limited reliance on analogous American law principles in the absence of a careful examination of the extent to which they may be inconsistent with English law.

Inc., 603 N.Y.S.2d 619, 621 (App. Div. 3d Dep't 1993).  Under
New York's "equitable ownership" test, however, it must be shown
that the defendant "exercised considerable authority over the
corporation to the point of completely disregarding the
corporate form and acting as though its assets were his alone to
manage and distribute."  Freeman, 119 F.3d at 1051 (quoting
Lally, 603 N.Y.S.2d at 621); see also Guilder, 651 N.Y.S.2d at
707.  But, even if UK law recognized an "equitable ownership"
theory of liability similar to that recognized in many American
jurisdictions, the factual findings of the Bankruptcy Court do
not support a finding that the UK Defendants -- to the exclusion
of Abbey, Marrache, and all others -- "exercised [such]
considerable authority over [Brearly] to the point of completely
disregarding the corporate form and acting as though its assets
were [theirs] alone to manage and distribute."  Freeman, 119
F.3d at 1051 (citation omitted).

      For a second and entirely separate reason, the record in
this case does not permit the piercing of Brearly's corporate
veil.  The factual findings cannot support veil-piercing because
of the key distinction in English law between using the
corporate form to evade or conceal existing legal obligations or
wrongs on the one hand, and using it to insulate oneself from
future or contingent liabilities on the other.  The evidence,
even when construed in the light most favorable to the

Plaintiff, reveals that, at the time Brearly was introduced into the transaction, the UK Defendants had not yet incurred any legal obligations to Tyson or the Kentucky Defendants with respect to sale of the International Rights.  See In re Tyson, 412 B.R. at 630-32.  Nor was Brearly's existence concealed from the parties; although the Bankruptcy Court did appear to conclude that Brearly was introduced into the transaction in bad faith, id. at 642, there is no evidence in the record to suggest that either Tyson or the Kentucky Defendants were unaware that Brearly was their contractual counterparty under the July 26 Assignment and Distribution Agreement, respectively.  As such, if they had doubts about the UK Defendants' good faith, Tyson and the Kentucky Defendants could have refused to deal with Brearly and/or the UK Defendants.[45]  Even if Brearly was a "perfect set-up" and "came in handy" for the UK Defendants, id., English law provides that a party is entitled to take advantage of the Salomon principle in order to limit its future liabilities, even where the corporate entity to be interposed is nothing more than a mere shell or fiction.  To paraphrase Adams: "[w]hether or not [the UK Defendants' use of Brearly was] desirable" as a matter of public policy, "the right to use a

---

[45] The Court makes no finding in this Opinion, however, concerning the reasonableness of Tyson's or the Kentucky Defendants' reliance for the purposes of analyzing the Plaintiff's tort claims.

corporate structure in this manner is inherent in [English] corporate law."  Adams, [1990] Ch. at 544.

E.   Plaintiff's Fraud and Unjust Enrichment Claims

In the Adversary Proceeding, the Plaintiff also asserted a fraud claim against Warren and Simons and an unjust enrichment claim against the four UK Defendants.  The Bankruptcy Court determined, applying New York choice-of-law principles, that Kentucky law governed these claims.[46]  The Bankruptcy Court concluded, however, that "the only damages that Plaintiff could assert from [his] fraud claim are the same contract damages that are being imposed on the UK Defendants by virtue of the piercing of Brearly's corporate veil."  In re Tyson, 412 B.R. at 645.[47]  Likewise, because relief on the veil-piercing claims was

---

[46] This finding was proper and has not been challenged on appeal.  See Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 397 n.1 (2d Cir. 2001) (observing that New York conflict-of-law principles recognize "depecage," or the application of different jurisdictions' laws to different claims for relief).

[47] The Bankruptcy Court revisited the question of a fraud recovery during post-trial motion practice.  Ruling from the bench, the court held that "[b]oth plaintiff and cross claimants have failed to establish each of the six issues that must be proved in order to sustain a fraud complaint under Kentucky law."  The court further concluded that "[t]his failure of proof is not cured by the Court's finding, which it reiterates, that the U.K. defendants used Brearly for improper and indeed fraudulent purposes.  That finding, however, does not entitle any plaintiff to a recovery sounding in common-law fraud."  Read in context, however, this ruling may have merely reflected the court's judgment that the Plaintiff and Kentucky Defendants could not prove additional damages beyond that permitted on a contractual recovery.

granted, the Bankruptcy Court concluded that "there is no cause to resort to the equitable doctrine of unjust enrichment to fashion a remedy in this case against Sports Network."[48]  <u>Id.</u> at 640.  The Bankruptcy Court thus declined to rule in the alternative regarding whether the Plaintiff would recover for fraud or unjust enrichment if veil-piercing had not been available.

Because the Bankruptcy Court erred in piercing Brearly's corporate veil, a question emerges whether the Plaintiff could recover the same money judgment, in full or in part, on his claims of fraud or unjust enrichment.  As this Court sits in an appellate capacity pursuant to 28 U.S.C. § 158(a)(1), it declines to make the first determination as to this question.  Thus, without expressing any opinion as to the proper outcome, the Court remands this case to the Bankruptcy Court so that it may consider, in the first instance, whether the Plaintiff may recover on his fraud and unjust enrichment claims.[49]

---

[48] In the August 2009 Opinion, the Bankruptcy Court implies that the Plaintiff's fraud claim was asserted against all four UK Defendants and that the unjust enrichment claim was brought against Sports Network alone.  The Plaintiff's operative complaint, however, asserts a fraud claim against Warren and Simons and an unjust enrichment claim against all four UK Defendants.

[49] Certain other arguments made by Warren on appeal, including that the Bankruptcy Court erred by failing to apply the Statute of Frauds and that the Bankruptcy Court incorrectly interpreted the July 26 Assignment, need not be addressed in light of this

F.   Warren's Claim for Attorney's Fees

Finally, Warren asserts that, in the event that he prevails on appeal, he is entitled to his attorney's fees under English law.  Under English practice, a prevailing party is ordinarily awarded its "costs," including attorney's fees.  See, e.g., APL Co. Pte. Ltd. v. UK Aerosols Ltd., 582 F.3d 947, 957 (9th Cir. 2009) ("Under the English rule, attorneys' fees are generally awarded to the prevailing party."); RLS Assocs., LLC v. United Bank of Kuwait PLC, 464 F. Supp. 2d 206, 210 (S.D.N.Y. 2006) ("RLS") ("Under the English rule, the prevailing party can generally recover its attorneys' fees from the losing party.").  In commercial litigation, an award of costs is normally entered against the party who is held indebted to the other.  See A.L. Barnes Ltd. v. Time Talk (UK) Ltd., [2003] EWCA Civ 402 (C.A.) ("Time Talk") [¶ 28] ("In what may generally be called commercial litigation . . . the disputes are ultimately about money.  In deciding who is the successful party the most important thing is to identify the party who is to pay money to the other.  That is the surest indication of success and

_____

Opinion's disposition of the veil-piercing claim and its remand to the Bankruptcy Court for further proceedings.

failure.").  The determination of such an award, however, rests within the discretion of the court.[50]

The Bankruptcy Court addressed this same question from the opposite perspective during post-trial motion practice, when the Kentucky Defendants sought an award of their attorney's fees under English law.  The Bankruptcy Court declined to award them attorney's fees on two separate grounds.  First, the Bankruptcy Court determined, citing Time Talk and Multiplex, that "English law places great emphasis on the monetary recovery obtained by a party in determining whether such party is a prevailing party entitled to attorneys' fees as part of costs under English law."  Because the Kentucky Defendants did not obtain any net monetary recovery under the Judgment, the Bankruptcy Court concluded that they were not entitled to costs under English law.

---

[50] See Civil Procedure Rules 1998, R. 44.3(1) ("The court has discretion as to -- (a) whether costs are payable by one party to another; (b) the amount of those costs; and (c) when they are to be paid"); id. R. 44.3(2) ("If the court decides to make an order about costs -- (a) the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party; but (b) the court may make a different order."); see also Hullock v. E. Riding of Yorkshire County Council, [2009] EWCA Civ 1039 [¶ 19] (C.A.) ("Costs are in the discretion of the trial judge."); Lamont v. Burton, [2007] EWCA Civ 429 [¶ 20] (C.A.) ("The court has a wide discretion under rule 44.3 to make whatever costs order it considers appropriate in the particular circumstances of the case, taking account of the various factors specified in the rule."); Multiplex Constrs. (UK) Ltd. v. Cleveland Bridge UK Ltd., [2008] EWHC 2280 (Q.B.D.) (Jackson, J.) ("Multiplex") [¶ 72] (summarizing principles for guiding a court's discretion in awarding attorney's fees).

Second, the Bankruptcy Court observed that "there is no authority applying the English law on shifting attorneys' fees" in U.S. court proceedings absent a clear contractual agreement by the parties.  In so concluding, the Bankruptcy Court implicitly applied the "American Rule" that each litigant is to bear his or her own costs of litigation, including attorney's fees.  See, e.g., Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (New York law) (noting that "attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party," and that any contrary intent by the parties should be made "unmistakably clear [in] the language of the contract" (citation omitted)); AIK Selective Self-Ins. Fund v. Minton, 192 S.W.3d 415, 420 (Ky. 2006) (Kentucky law) ("[W]ith the exception of a specific contractual provision allowing for recovery of attorneys' fees . . .  each party assumes responsibility for his or her own attorneys' fees." (citation omitted)).

In the absence of any significant federal bankruptcy policy, a bankruptcy court applies the choice-of-law rules of the forum state.  Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 607 (2d Cir. 2001).  New York's choice-of-law principles would treat the English rule regarding attorney's fees as "substantive," not procedural, and thus where English law governs a given cause of action, so too should the English

rule regarding attorney's fees.  RLS, 464 F. Supp. 2d at 218
("[T]he English rule creates a quasi-right of action for
'wrongful' legal costs. . . . These quasi-rights of action,
which are created by the English rule for attorneys' fees,
accompany every cause of action under English law.")

Given that any award of attorney's fees under English law
rests in the court's discretion, and given that the Plaintiff or
Kentucky Defendants may ultimately prevail in this litigation on
other grounds, it is premature to determine whether, and if so
to what extent, Warren should recover any award of attorney's
fees for his victory on the veil-piercing claim.  The Court
therefore declines to reach this ground of Warren's appeal,
leaving it to the Bankruptcy Court to address this question in
the first instance.

### III. Kentucky Defendants' Appeal

The Kentucky Defendants appeal the Bankruptcy Court's
"refusal to provide them monetary relief."  They assert three
points of error, each in the alternative.  First, the Kentucky
Defendants challenge the Bankruptcy Court's refusal to recognize
a default judgment obtained by Straight-Out against Brearly in
Kentucky federal court on December 16, 2008 (the "Kentucky
Default Judgment") as binding against the UK Defendants.
Second, the Kentucky Defendants challenge the Bankruptcy Court's

refusal to grant their post-trial motion for leave to amend their pleadings to assert a fraud cross-claim against the UK Defendants and/or to conform their pleadings to match the evidence at trial.  Third, the Kentucky Defendants assert that the Bankruptcy Court erred in refusing to award them attorney's fees under English law.  Each argument is addressed in turn below.

A.   Kentucky Default Judgment

    The Kentucky Defendants' first argument on appeal is that the Bankruptcy Court erred by failing to recognize and enforce the Kentucky Default Judgment.  For the following reasons, the Bankruptcy Court's Judgment is vacated insofar as it denies the Kentucky Defendants a monetary recovery, and the case is remanded for further proceedings.

    1.   Facts and Procedural History

    On August 13, 2004, shortly after the Fight, Straight-Out filed two lawsuits in the United States District Court for the Western District of Kentucky (the "Kentucky Court").  One lawsuit was filed against Brearly (the "Kentucky Litigation") alleging breach of contract and unjust enrichment for failure to pay Straight-Out its $2.7 million minimum guarantee under the Distribution Agreement.  The other lawsuit was filed against Warren, Sports & Leisure, and Sports Network for breach of

several other contracts that are not at issue in this
litigation.[51]   The same attorney appeared to represent all
defendants in both actions, and the attorney successfully
obtained dismissal on forum non conveniens grounds of the non-
Brearly action.   After the Kentucky Court denied Brearly's
motion to dismiss in the Kentucky Litigation and granted Brearly
several extensions of time to answer, the Kentucky Court
subsequently permitted Brearly's attorney to withdraw, and
Brearly thereafter defaulted.   After Straight-Out moved for a
default judgment, the Kentucky Court granted that motion on or
about March 1, 2006 in what it termed its "Default Judgment
Order," subject to the court's retention of jurisdiction over
post-judgment discovery.

   After no further damages were proved, final judgment was
entered on December 16, 2008.   The Kentucky Default Judgment
entered against Brearly totaled $4,554,191, including: (1) a
principal sum of $2.7 million, which was the amount of Straight-
Out's minimum guarantee under the Distribution Agreement; (2)
pre-judgment interest at 8% per annum (totaling $356,580); (3)
attorney's fees for prosecuting the Kentucky Litigation and
obtaining the default judgment (totaling $71,875); (4) a 30%
contingent attorney's fee ($938,537); (5) anticipated costs and

---

[51] These contracts included, inter alia, a co-promotional rights
agreement and a provision-of-services agreement to compensate
Tyson's opponent, Williams, for his participation in the Fight.

expenses to be incurred in attempting to collect on the judgment ($87,500); and (6) post-judgment interest accruing from March 1, 2006 at the rate of 4.70% per annum, compounded annually.

Meanwhile, on August 17, 2007, the Bankruptcy Court in New York granted the Kentucky Defendants' motion to vacate the default judgment entered against them in the Adversary Proceeding.  See August 2007 Opinion, 2007 WL 2379624.  On September 10, 2007, the Kentucky Defendants asserted a cross-claim against the UK Defendants alleging, in pertinent part, that "[a]s the alter ego of Brearly, the [UK Defendants] are liable to Straight-Out for the liabilities of Brearly, including the amounts due under the Kentucky [Default] Judgment."  Trial was held on the Kentucky Defendants' veil-piercing cross-claim concurrently with the Plaintiff's claims in March 2009.

In the August 2009 Opinion, the Bankruptcy Court declined to recognize the Kentucky Default Judgment as binding against Brearly or the UK Defendants, finding that "[t]he Kentucky Defendants overreach when they argue that the default judgment entered in the Kentucky litigation regarding Straight Out's breach of contract claim against Brearly should be determinative and conclusive on the amount of damages."  In re Tyson, 412 B.R. at 639.  In particular, the Bankruptcy Court suggested that the Kentucky Default Judgment was premised on an erroneous calculation of damages, given the evidence at trial that

Straight-Out had assigned away "the entire amount of its $2.7 million guaranteed recovery" from Brearly through the July 26 Assignment.  Id.  The Bankruptcy Court concluded that "[s]ince the proceeds from the international sales of the Fight did not exceed $2.7 million, Straight Out did not establish that it has a right to a net contractual recovery based on the record in this case."  Id.

After the August 2009 Opinion was issued, the Kentucky Defendants registered the Kentucky Default Judgment in the Southern District of New York pursuant to 28 U.S.C. § 1963 on August 26, 2009.  Thereafter, the Kentucky Defendants again sought recognition of the Kentucky Default Judgment by the Bankruptcy Court, and in particular, sought to transform the attorney's fee component of the Kentucky Default Judgment into a monetary recovery against the UK Defendants to be included in the Bankruptcy Court's Judgment.  In proceedings held on the record before the Bankruptcy Court on October 22, 2009, the Bankruptcy Court declined to subsume any part of the Kentucky Default Judgment into the Bankruptcy Court's Judgment.  The Bankruptcy Court observed, inter alia, that there appeared to be no basis under Kentucky law for the Kentucky Court's decision to award attorney's fees to Straight-Out.

2.  Analysis

The Kentucky Defendants argue that the Bankruptcy Court "erred by failing to give Full Faith and Credit" to the Kentucky Default Judgment.[52]  The Kentucky Defendants argue that the Bankruptcy Court should have applied the Kentucky Default Judgment against the UK Defendants by using res judicata to bar the UK Defendants from contesting the amount of damages on the Kentucky Defendants' veil-piercing claims.  While recognizing that the UK Defendants were not actually parties to the supposedly preclusive Kentucky Litigation, the Kentucky Defendants assert that the UK Defendants "completely controlled the legal defense of Brearly before the Kentucky federal district court," and therefore that the UK Defendants are now

---

[52] Alternatively, the Kentucky Defendants contend on appeal that the Bankruptcy Court has failed to comply with 28 U.S.C. § 1963, which provides:

> A judgment in an action for the recovery of money or property entered in any . . . district court . . . may be registered by filing a certified copy of the judgment in any other district . . . . A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.

28 U.S.C. § 1963.  This statute has no bearing, however, on whether res judicata applies in order to bar defendants in a subsequent proceeding from contesting liability or damages based on the results of a previous proceeding.  As such, the Kentucky Defendants' discussion of § 1963 does not appear relevant to their arguments that the Bankruptcy Court should have held that the UK Defendants were estopped from contesting the amount of damages to be imposed against them.

bound by the Kentucky Default Judgment pursuant to Taylor v. Sturgell, 553 U.S. 880, 128 S. Ct. 2161 (2008).[53]

"The preclusive effect of a federal-court judgment is determined by federal common law." Taylor, 553 U.S. at __, 128 S. Ct. at 2171. "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" Id. "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." Id. (citation omitted). Meanwhile, "[i]ssue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." Id. (citation omitted). Both of these doctrines have the effect of "precluding parties from contesting matters that they have had a full and fair opportunity to litigate." Id. (citation omitted).

"A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and

---

[53] The Kentucky Defendants also argue, in the alternative, that the Bankruptcy Court should have directly enforced the Kentucky Default Judgment against the UK Defendants following the Bankruptcy Court's holding that Brearly's corporate veil would be pierced. Because the Court reverses the decision to pierce Brearly's corporate veil, however, this alternative argument is moot.

issues settled in that suit," and therefore, a person is not bound by a judgment "in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Id. (citation omitted). The Supreme Court has, however, enumerated six exceptions to this general "rule against nonparty preclusion." Id. at 2172. On appeal, the Kentucky Defendants assert that either of two Taylor v. Sturgell exceptions should apply. The first proffered exception dictates that a nonparty is bound by a prior judgment if that nonparty "assumed control over the litigation in which that judgment was rendered," id. at 2173 (citation omitted), and the second dictates that a party is bound where the nonparty is a "proxy," "agent," or "designated representative" of a "person who was a party to the prior adjudication." Id.

Although the Kentucky Defendants presented their res judicata arguments to the Bankruptcy Court on summary judgment and again at trial, the August 2009 Opinion does not address this theory of recovery, instead concluding only generally that "the Kentucky Defendants overreach[ed]" in this respect. In re Tyson, 412 B.R. at 639. The Kentucky Defendants re-asserted their res judicata argument during post-trial motion practice, but the Bankruptcy Court concluded that "it would be an abuse of process for this Court simply to enforce the Kentucky [Default] [J]udgment against the U.K. defendants" given the fact that

69

Straight-Out had "signed all of the recovery proved in this case to Tyson."  The Bankruptcy Court also stated during oral argument at the summary judgment stage, in reference to the potential preclusive effect of the Kentucky Default Judgment, that "the doctrine of res judicata requires a final judgment on the merits, which we do not have in this case."[54]

Because the Bankruptcy Court did not clearly address the question of whether the Kentucky Default Judgment may preclude the UK Defendants from contesting liability and/or damages on the Kentucky Defendants' cross-claims pursuant to either of the proffered Taylor v. Sturgell exceptions, the Court declines to determine in the first instance whether either of these exceptions applies.  On remand, the Bankruptcy Court shall determine, notwithstanding evidence that the Kentucky Court may

---

[54] As a general statement of the law, this observation was in error.  "[I]t has long been the law that default judgments can support res judicata [i.e., claim preclusion] as surely as judgments on the merits."  EDP Med. Computer Sys., Inc. v. U.S., 480 F.3d 621, 626 (2d Cir. 2007) (citing Morris v. Jones, 329 U.S. 545, 550-51 (1947)).  It is not clear, however, that claim preclusion is the right framework for understanding this dispute.  If the Kentucky Defendants' theory is understood instead as relying upon offensive issue preclusion, then the fact that the judgment was obtained by default will prevent recovery.  The difference between claim preclusion and issue preclusion may be critical in this context, because "Judgment by default . . . . does not warrant issue preclusion for the very reason that the issues have not been litigated or decided."  18A Wright, Miller & Cooper, Fed. Prac. & Proc. § 4442; see Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 37 (2d Cir. 2005) (describing the requirements for applying offensive collateral estoppel).

have been mistaken in calculating the amount of damages, whether
the Kentucky Defendants are entitled to use claim preclusion
and/or offensive issue preclusion to enforce the Kentucky
Default Judgment against the UK Defendants in the Adversary
Proceeding.

B.   Rule 15(b)(2) & Rule 54 Motions

        Second, the Kentucky Defendants assert that the Bankruptcy
Court should have "[e]ither sua sponte or as a result of [their]
post-Opinion motion" amended the Kentucky Defendants' pleading
to include a fraud cross-claim against the UK Defendants.  The
Kentucky Defendants observe that "[t]he issue of fraud [was]
litigated and actively contested" throughout the Adversary
Proceeding based on the Plaintiff's own fraud claim against the
UK Defendants and, therefore, that no unfair prejudice would
result from such amendment.  The Kentucky Defendants further
interpret the August 2009 Opinion as making "obvious and clear
findings of fact that fraud was actually committed by the UK []
Defendants against both the Plaintiff and [the Kentucky
Defendants] -- even using the word 'defrauded.'"  The Kentucky
Defendants assert that the court's factual findings represented
"clear and convincing evidence" sufficient to satisfy the burden
of proof as to each of the six elements of fraud under Kentucky

law.  See Flegles, Inc. v. Truserv Corp., 289 S.W.3d 544, 549
(Ky. 2009).

Following oral argument, the Bankruptcy Court concluded
that the Kentucky Defendants' Rule 15(b)(2) and Rule 54 motions
must be denied for at least three reasons.  First, the
Bankruptcy Court concluded that to add "a fraud claim or a claim
for punitive damages . . . . would prejudice the defendants and
would not be permitted."  Second, the Bankruptcy Court found
that, while the issue of fraud had indeed been litigated at
trial, the Plaintiff had failed "to prove entitlement to either
a fraud recovery or to punitive damages in its claim."[55]  Third,
the Bankruptcy Court again found that the Kentucky Defendants
had not suffered any damages because they assigned away their
rights to recovery from Brearly under the Distribution
Agreement.

Although the Bankruptcy Court appears to have supported its
ruling on the Rule 15(b)(2) and Rule 54 motions on independent
grounds, it is nevertheless advisable to allow the Bankruptcy
Court to revisit this issue on remand, given that the Bankruptcy
Court must now address for the first time the Plaintiff's fraud
and unjust enrichment claims.  Accordingly, the Court vacates

---

[55] As discussed above, however, the Bankruptcy Court may simply
have been expressing its view that the Plaintiff had proven no
right to damages beyond those he could recover under the breach-
of-contract claim.

the Bankruptcy Court's denial of the Kentucky Defendants' Rule
15(b)(2) and Rule 54 motions and remands for reconsideration
without expressing any view as to whether the applications
should be granted.

C.   Attorney's Fees

Finally, the Kentucky Defendants assert that the Bankruptcy
Court erred in refusing to award them attorney's fees under
English law.  In light of the disposition of the veil-piercing
claim, however, this aspect of the Kentucky Defendants' appeal
need not be addressed and is dismissed as moot.

## CONCLUSION

The October 27, 2009 final judgment of the Bankruptcy Court
is vacated in part.  The case is remanded for further
proceedings consistent with this Opinion.

SO ORDERED:

Dated:   New York, New York
         July 26, 2010

_____
DENISE COTE
United States District Judge

73